# EXHIBIT 1

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1739445
(Cite as: Not Reported in A.2d)

Page 1

Not Reported in A.2d, 2001 WL 1739445
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
STATE of Delaware
v.
Edmund BAILEY, Defendant.

Nov. 30, 2001.

OPINION AND ORDER

*1 Defendant, Edmund Bailey, has been indicted for serious drug offenses involving the alleged distribution of marijuana. After completing the case review process, Bailey asked for permission to file a motion to suppress evidence, out of time. The court granted the motion and the suppression hearing was held on September 17, 2001.

The suppression question involves a video tape recording made by surreptitious surveillance of a storage locker, and appearing to show Bailey repackaging marijuana. As discussed below, Bailey contends that the video surveillance violated his reasonable expectation of privacy and the video tape cannot be used at his trial. By the same token, Bailey challenges the later search of his residence, which was based on the fruits of the surveillance.

I.

For present purposes, the parties mostly agree about the facts. Suspecting that a locker in a self-storage facility was being used for drug activity, the police secretly set up a hidden, video surveillance system. The system monitored a specific, locked storage locker rented by Bailey, and the surrounding area. It was secured by a padlocked, metal door. The locker, Unit No. 5107, was the third in a row of approximately twelve lockers. Across the aisle from the row of lockers that was under surveillance was a similar row of lockers. The aisle between the rows of lockers was secured at either end by an overhead, roll-down door. Together, the two rows of lockers made up a single storage facility unit.

The storage unit was one of several that comprised the self-storage facility. The entire facility was fenced, and not open to the public. Access to the facility, which Bailey knew was monitored by video cameras, was by coded keypad. The facility's employees, customers and their guests had access to the facility. And, anyone with access to the facility could move freely about the locker areas. Apparently, only a renter or authorized person had access to a particular locker, including the locker that was put under surveillance.

The parties clashed over just how private, or public, the storage facility and the locker and the area were. It appears that the facility was intended for the exclusive use of people with authorized access to the lockers and for the storage facility's staff. It further appears that someone using a storage locker, like Bailey, could not see any video surveillance equipment in the area where the lockers were located. Thus, it would be reasonable to assume that the area was not under video surveillance. But anyone, including Bailey, would understand that several people had reasons and permission to move throughout the facility, including the area around Bailey's locker.

More importantly, even with Bailey assuming that he was not under surveillance, Bailey knew he was in a commercial storage facility, where security clearly was a concern. Hidden surveillance for security, including loss prevention, was a reasonable possibility. In fact, the police had permission to use the locker across from Bailey's locker. After they installed their hidden camera and trained it on the entrance to Bailey's locker across the aisle, they were able to video tape Bailey from their lawful vantage point simply because he left his locker door ajar.

*2 The court is unwilling to accept Bailey's testimony that he specifically asked someone associated with the storage facility whether the lockers were under surveillance and that he was told they were not. The court's skepticism, in part, is due to its assessment of credibility. Over all, Bailey's testimony was too self-serving. For example, apparently to bolster his alleged expectation of privacy, Bailey testified that the overhead doors were closed while he was in the locker. The lighting does not appear to be consistent with that claim. Moreover, Bailey can be seen

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1739445
(Cite as: Not Reported in A.2d)

Page 2

looking around and checking to be certain that no one was approaching his locker as he went about his business there. When confronted by the prosecutor on cross-examination, Bailey claimed inconsistently that he heard a car passing by the storage unit. As discussed below, however, the decision here does not turn on credibility.

Even discounting Bailey's gilding the lily, however, he obviously thought he was not under surveillance. The court is satisfied that Bailey had no subjective reason to believe that his activities were being monitored electronically when he was alone inside his rented, storage locker. By the same token, the court finds that while Bailey could not be assured of complete privacy, he reasonably believed that as he was working in the locker, he would hear anyone's approach in time to conceal his conduct. As discussed below, however, Bailey's belief that the coast was clear does not amount to a constitutionally recognized expectation of privacy.

II.

As mentioned, Bailey claims that all evidence seized during the search of the storage Unit No. 5107 and his residence should be suppressed. He argues that the "placement of the electronic surveillance video camera was effected without the authorization of a search warrant issued by a court." Thus, Bailey claims that the video surveillance infringed on his Fourth Amendment right to privacy. Because the search warrants for the locker and Bailey's residence are based on the video surveillance set up by police, and that information was not disclosed to the issuing magistrate, the warrants are questionable.

In deciding if electronic monitoring is a violative search under the Fourth Amendment, the court has to consider whether the citizen can claim a "legitimate expectation of privacy." FN1 The court must address two questions. First, it must determine whether the citizen "by his conduct has exhibited an actual (subjective) expectation of privacy" and that he or she "seeks to preserve [something] as private." FN2 Second, the court must determine "whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable." FN3 Finally, if the individual does not have a reasonable expectation of privacy in the area, there is "no fourth amendment violation regardless of the nature of the search." FN4

FN1. *Smith v. Maryland,* 442 U.S. 735, 740 (1979) (citing *Katz v. United States,* 389 U.S. 347 (1967)).

FN2. Id.

FN3. Id.

FN4. *Thompson v. Johnson County Community College,* D. Kan., 930 F.Supp. 501, 507 (1996) (quoting *United States v. Taketa,* 9th Cir., 923 F.2d 665, 672 (1991)).

Several courts have considered the nature of the intrusion in determining when a citizen has a legitimate expectation of privacy. FN5 For video surveillance, in particular, court decisions have hinged on each case's specific facts, including the method and duration of the video surveillance, the monitored area and the individual's steps taken to protect his or her privacy. FN6 Decisions have varied with each case's fact pattern. Generally, however, courts accept warrantless surveillance of common areas and hallways, since these areas are not considered private. FN7 Under some circumstances, courts have gone as far as approving warrantless searches of places that defendants have assumed are most private, such as public bathroom stalls. FN8

FN5. See *Bond v. United States,* 529 U.S. 334 (2000); *State v. Costin,* Vt.Supr., 720 A.2d 866 (1998); *Vega-Rodriguez v. Puerto Rico Telephone Co.,* 1st Cir.,110 F.3d 174 (1997).

FN6. See *Vega-Rodriguez,*110 F.3d at 179-180.

FN7. While analyzing a warrantless arrest in an apartment building's common hallway, the Second Circuit generally observed, "common halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors.... [N]ever have we held that the common areas must be accessible to the public at large nor have we required a quantified amount of daily traffic through the area as a basis for determining that a common area is beyond an individual's protected zone of privacy." *United States v. Holland,* 2nd Cir., 755 F.2d 253, 255-256 (1985) (citations omitted). See also *United States v. Acosta,* 3rd Cir., 865

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1739445
(Cite as: Not Reported in A.2d)

Page 3

F.2d 1248 (1992) (adopting the Second Circuit's approach).

FN8. See *State v. Tanner,* Ohio Ct.App., 537 N.E.2d 702 (1988).

### III.

*3 This court must look at the particular facts surrounding Bailey. As mentioned, he rented a locker unit in a self-storage commercial facility. Bailey merely was one of many people with access to the facility. Although he may have had sole access to his personal unit, the locker was one of twelve on an open aisle way, within a warehouse. The warehouse was not locked and was readily accessible to others.

No matter how Bailey characterizes the warehouse containing his rented storage unit, semi-private or semi-public, the fact remains that he had no objectively reasonable expectation of privacy in the general area. FN9 While the commercial storage facility was not exactly public, it was not private and Bailey knew as much. FN10 Again, Bailey may have thought he was by himself, but he was aware that his privacy was tenuous, at best.

FN9. See *Thompson,* 930 F.Supp. at 507 (finding that plaintiff did not have a reasonable expectation of privacy in personnel storage locker area).

FN10. See *United States v. McGrane,* 8th. Cir., 746 F.2d 632 (1984).

Bailey suggests that *Howard v. State,* is controlling. *Howard* is considerably different. *Howard* concerns a confidential communication between a husband and wife. The court found that they had an objectively reasonable expectation of privacy to their privileged communication, even in a police station interrogation room. *Howard* specifically states that:
> the fact that the subjects of the videotaped conversations at issue in this case were married to each other significantly changes the analysis of the issue. The parties' marital status is important since Delaware has chosen to provide evidentiary protection to communications between married persons.

In contrast to *Howard,* as Bailey worked in the locker, with its door open, he did not have any expectation of privacy remotely approaching that of a wife and a husband speaking to each other. The monitored exchange in *Howard* is legally privileged.

Here, Bailey was doing nothing privileged. So, *Howard* is not helpful.

While Bailey may have wanted to believe he was in a private place, the fact is that Bailey was not in private. FN11 His locker was one in an area full of lockers. He had no idea when any other renters, the facility's owners, staff or guests, would happen by, or who may or may not have had monitoring equipment in the area. What the police did here, anyone else with access to the facility could have done. That was a risk that Bailey took.

FN11. See *Cowles v. State,* Alaska Supr., 23 P.3d 1168 (2001) (Due to open nature of ticket office, video camera hidden in ceiling to monitor defendant's suspected thefts did not violate Fourth Amendment.).

Presumably, if Bailey simply had closed the door, the police would have needed a court order to gain physical or visual access to the locker. By leaving the door open, Bailey chose to expose himself and his locker's contents to the view of others. Anyone happening down the aisle way could have easily viewed the contents of Bailey's locker. If Bailey had a reasonable expectation of privacy in his secured storage locker, FN12 when he left the door open, his expectation of privacy diminished to a mere belief that he was alone. And, even if a subjective expectation of privacy remained, it became an expectation that society will not recognize as reasonable.

FN12. See *State v. Foreman,* Ind.Supr., 662 N.E.2d 929, 933-934 (1996) ("When the doors were closed and locked and access ... cut off, a measure was taken to maintain privacy....").

In summary and as mentioned, the court assumes without deciding that Bailey would have had a reasonable expectation of privacy if he had shut the door. FN13 But as discussed, Bailey did nothing to protect his privacy except glance around. Bailey did not think he was in private when he was in his locker. In fact, he knew he was in a place accessible to many people, and over which he did not have control. He just thought he was alone and that no one was watching. That assumption, even if it were reasonable, does not amount to a protected expectation of privacy under the circumstances.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1739445
(Cite as: Not Reported in A.2d)

Page 4

FN13. See e.g. *United States v. Valenzuela,* 9th Cir., 596 F.2d 1361, 1365 n. 3 (1979) ("It is a simple matter for the occupant of a dwelling to close the door, and thus prevent unannounced entry in violation of his or her reasonable expectation of privacy."), *cert. denied, Valenzuela v. United States,* 444 U.S. 865 (1979).

*4 Finally, in upholding the police conduct here, the court not only is concerned about illegal drugs. The court is mindful of the threat to liberty posed by unchecked government surveillance. The court appreciates that the police are tempted by advances in surveillance technology. This decision, however, does not define the right to privacy merely in terms of the latest improvement in electronics and optics. The state of the art in surveillance equipment does not define the state of the law of privacy. At some point the court may have to draw the line. But not now. As discussed, Bailey knew he was in a semi-public place of business. He was not doing anything inherently private. The surveillance equipment was on someone else's property. And Bailey easily could have taken better steps to protect his privacy, which he did not do. The court would use the exclusionary rule to protect Bailey's rights. It will not use the rule here out of concern for what the police might do in the next case.

IV.

For the foregoing reasons, Bailey's Motion to Suppress is DENIED.

IT IS SO ORDERED.

Del.Super.,2001.
State v. Bailey
Not Reported in A.2d, 2001 WL 1739445

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.